# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LAURA PERRYMAN and GARY PERRYMAN | ) ) ) | |
| Petitioners, | ) ) ) | |
| v. | ) ) | C.A. No. 2020-0079-SG |
| STIMWAVE TECHNOLOGIES INCORPORATED, | ) ) ) ) | |
| Respondent. | ) ) | |

## <u>MEMORANDUM OPINION</u>

Date Submitted:  November 13, 2020
Date Decided:  December 9, 2020

Steven L. Caponi and Matthew B. Goeller, of K&L GATES LLP, Wilmington, Delaware; OF COUNSEL: Justin H. Roeber and Thomas A. Warns of K&L GATES LLP, New York, New York, *Attorneys for Petitioners Laura Perryman and Gary Perryman*.

Richard P. Rollo, Kevin M. Gallagher, Travis S. Hunter, Angela Lam, Nicole M. Henry, and Christian C.F. Roberts, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, *Attorneys for Respondent Stimwave Technologies Incorporated*.

GLASSCOCK, Vice Chancellor

The DGCL permits corporations to extend to indemnified officers and directors rights to advancement of litigation costs relating to their service.[1] Such benefits are a recognition of the fact that such individuals may, as a function of their corporate positions, find themselves faced with legal costs that are burdensome or insupportable. Advancement is a benefit extended to these employees to induce them to provide their services to the corporation.

Such advancement comes with a requirement that the indemnified individual undertake to repay the corporation if the cost of the matter in litigation proves ultimately not to be indemnifiable.[2] This permits advancement so that the individual may afford to litigate before the matter of indemnifiability is ultimately determined, by which point any advancement right would be nugatory. The undertaking, in theory, allows the corporation to recoup advanced sums that prove not indemnifiable.[3]

While the contractual rights to advancement are often straightforward, these benefits have generated an inordinate amount of litigation. The reason is easy to identify; where the corporation itself is suing an indemnified individual for what it believes to be malfeasance or breach of duty to the corporation, its principals find it galling to be footing both the costs of prosecuting, and defending, the same litigation.

---

[1] 8 *Del. C.* § 145(e).

[2] *Id.*

[3] I say in theory, because as a practical matter the individual may prove unable to make repayment.

1

Given the contractual rights involved, however, it is unusual in my experience for a defense to a demand for advancement to be wholly successful.

This advancement matter turns on two deceptively simple-sounding questions: (1) does Respondent Stimwave's certificate of incorporation, post a 2018 amendment, require approval of indemnification agreements by the company's Series D equity holders, and (2) if so, did the Petitioners, Laura Perryman, the former CEO of Respondent Stimwave, and her husband, Stimwave Director Gary Perryman,[4] sign and execute their indemnification agreements before the amendment? If I find that the amended charter does not require approval, then the inquiry ends and the Perrymans are entitled to advancement. But if I find that the amended charter does require Series D approval, the question becomes one of timing. If I find that the Perrymans executed their indemnification agreements *before* the charter was amended on April 23, 2018, again, their agreements are valid. But if I find that they executed their agreements after Stimwave's July 17, 2018 charter amendment, their agreements are invalid, because, pursuant to the charter amendment, extension of such benefits are void without the required the approval of Series D stockholders, which no party attempted to obtain.[5]

---

[4] I refer to the Perrymans individually in this Memorandum Opinion by their first names, in aid of clarity. I intend no disrespect thereby.

[5] The April 2018 charter amendment required Series D approval for extension of benefits, but did not provide that unauthorized extensions were void *ab initio,* as did the July amendment. Because of my decision here, I need not analyze the effect of an extension of benefits purported to have been made under the terms of the April charter amendment.

The parties tried this issue; in this Memorandum Opinion, I find that Gary's agreement regarding advancement is valid and enforceable, and that Laura's is not.

## I. BACKGROUND[6]

*A. The Parties*

Respondent Stimwave Technologies Incorporated ("Stimwave") is a Delaware corporation.[7]

Petitioner Laura Perryman is the founder and former CEO of Stimwave; she is and has been a director of Stimwave since its founding in 2010.[8]  Petitioner Gary Perryman is Laura Perryman's husband and is and has been a director of Stimwave since 2013.[9]

*B. Factual Overview*

### 1. Stimwave's Bylaw, Charter, and Amendments Thereto

Stimwave was founded in 2010 as Neural Micro Incorporated.[10]  Article X, Section 2 of the Company's Certificate of Incorporation (the "Certificate of Incorporation" or the "Charter") provides that "[a] right to indemnification or to advancement of expenses arising under a provision of this Certificate of

---

[6] The facts, except where otherwise noted, are drawn from exhibits jointly submitted at trial and are referred to according to the numbers provided on the parties' joint exhibit list ("JX __").

[7] JX 13; JX 67; JX 19.

[8] JX 67.

[9] JX 67.

[10] JX 13; JX 67; JX 19.

Incorporation or a bylaw of the Corporation shall not be eliminated or impaired by an amendment to this Certificate of Incorporation after the occurrence of an act or omission that is the subject of the civil, criminal, administrative, or investigative action, suit, or proceeding."[11]  The Company's bylaws (the "Bylaws"), which were filed on December 9, 2010, provide in Article VIII, Section 1, that "[t]he Corporation shall indemnify any and all of its directors or officers, including former directors or officers . . . to the fullest extent permitted under and in accordance with the laws of the State of Delaware."[12]

In April of 2018, Echo Vibrations invested $5 million in Stimwave in exchange for Series D shares.[13]  In connection with that investment, on April 20, 2018, Stimwave resolved to, among other things, both approve a form of indemnification agreement ("IA") and amend its Certificate of Incorporation.[14] Accordingly, the Company amended its Certificate of Incorporation on April 23, 2018 (the "April 2018 Amended Charter").[15]  Article V, Section 6(d) of the April 2018 Amended Charter provides that:

> As long as any shares of the Series D Preferred Stock shall be issued and outstanding . . ., the Corporation shall not, without first obtaining the approval (by vote or written consent as provided by law) of the holders of sixty-eight percent (68%) of the outstanding shares of the

---

[11] Petitioners' Opening Post-Trial Br. 27–28 (quoting JX 19), Dkt. No. 106; *see* 8 *Del. C.* § 145(f).
[12] JX 13, at Art. VIII, Section 1.
[13] JX 17.
[14] JX 16, at 3, 5.
[15] JX 16; JX 19.

4

Series D Preferred Stock, voting as a separate class: . . . (xiii) enter into or effect any Affiliate Transaction . . . [or] (xviii) adopt or amend any cash bonus, severance agreement, employment agreement or similar agreement or terms of compensation or benefits with respect to any executive officer . . . .[16]

An "Affiliate Transaction" is defined as "any transaction with an officer, director, employee or stockholder of the Corporation, or any of their affiliates, outside of the ordinary course of business."[17]

In July of 2018, SV Health Investors ("SV") invested $15 million in Stimwave in exchange for Series D shares.[18] That investment was also accompanied by and conditioned upon an amendment of Stimwave's charter.[19] Accordingly, on July 17, 2018, Stimwave again amended its Charter (the "July 2018 Amended Charter).[20] Article V, Section 6(d) of the July 2018 Amended Charter, which remains in effect, provides that:

> As long as any shares of the Series D Preferred Stock shall be issued and outstanding . . ., the Corporation shall not, without first obtaining the approval (by vote or written consent as provided by law) of the holders of sixty-eight percent (68%) of the outstanding shares of the Series D Preferred Stock, voting as a separate class and any such act or transaction entered into without such consent or vote shall be null and void ab initio and of no force or effect: . . . (xiii) enter into or effect any Affiliate Transaction . . . [or] (xviii) adopt or amend any cash bonus, severance agreement, employment agreement or similar agreement or

---

[16] JX 19, at Art. V, § 6(d)(xiii), (xviii).
[17] JX 19, at Art. V, § 6(a)(x).
[18] JX 22.
[19] JX 22, at Section 1.1.
[20] JX 21.

5

terms of compensation or benefits with respect to any executive officer . . . .[21]

The only change in Article V, Section 6(d) between the April 2018 Amended Charter and the July 2018 Amended Charter is the addition of the phrase "and any such act or transaction entered into without such consent or vote shall be null and void ab initio and of no force or effect" after the requirement that the Series D Preferred Stockholders vote as a separate class.

## 2. Background

On October 7, 2019, Stimwave received a civil investigative demand from the U.S. Department of Justice (the "DOJ") pursuant to the False Claims Act.[22] On November 10, 2019, Stimwave's Co-Chairman of the Board, Paul LaViolette, told Laura that she needed to step down.[23] At trial, Laura testified that she did not agree to step down as CEO when LaViolette asked her to on November 10, 2019.[24] In her deposition, however, she said that she did agree to step down during that meeting.[25] The record is unclear as to the date Laura ceased to be CEO of Stimwave.

On November 11, 2019, Laura emailed an indemnification agreement ("Laura's January 1, 2018 IA") to Stimwave and its attorneys, signed by Laura both

---

[21] JX 21, at Art. V, § 6(d)(xiii), (xviii).
[22] JX 69; *see* 31 U.S.C. § 3733.
[23] Sept. 28, 2020, Trial Tr. – Volume I, 168:8–19.Dkt. No. 110 [collectively, with Sept. 29, 2020, Trial Tr. – Volume II, Dkt. No. 111, "Trial Tr."].
[24] Trial Tr. 169:8–11.
[25] Trial Tr. 169:17–19.

6

as CEO on behalf of Stimwave and as indemnitee.[26] That document bore a date of January 1, 2018 and was signed using DocuSign.[27] Upon receipt of that agreement, Stimwave's board of directors (the "Board") agreed to provide advancement for Laura's costs involving the DOJ investigation.[28]

On December 16, 2019, Stimwave filed a verified complaint, alleging that Laura had breached fiduciary duties to Stimwave, including, among other things, that Laura had "directed accounting staff to make changes to the accounting system and remove invoice references on checks with Wite-Out and photocopying so that invoices selected by the auditors for their revenue sample would appear to have been paid when, in fact, those invoices had not been paid."[29] That complaint was amended in February 2020, to include claims that Laura had used Company assets to pay for her son's apartment, to further her personal interests, and to pay bonuses to her close friends.[30] Stimwave also filed what I think is fair to call a weak allegation of fiduciary breach against Gary, stating that he "act[ed] in concert" with Laura and was "disruptive" in Board meetings.[31]

---

[26] JX 30; JX 4.

[27] JX 4. DocuSign is a company that provides electronic signature services. DocuSign, https://www.docusign.com/ (last visited on December 9, 2020).

[28] JX 38.

[29] Verified Complaint ¶ 5, C.A. No. 2019-1003-SG, Dkt. No 1.

[30] Amended Complaint ¶¶ 65, 146, 172, 174–76, C.A. No. 2019-1003-SG, Dkt. No 88.

[31] *Id.* ¶¶ 75, 271, 272.

At some point in November or December 2019, but no later than December 20, 2019, Jeff Goldberg, one of Stimwave's directors, noticed that Laura's January 1, 2018 IA contained language that he had personally proposed for his own indemnification agreement when he joined the Board in early 2018.[32] He then checked the creation date for Laura's January 1, 2018 IA and saw that it bore a November 11, 2019 creation date—a date that was later verified by an e-discovery vendor and DocuSign.[33] He brought that information to the Board. At a December 20 board meeting, a majority of the Board concluded that Laura's January 1, 2018 IA was not valid because it was created on November 11, 2019—"after the DoJ's civil investigative demand."[34] The Board also concluded at that meeting that Gary Perryman's indemnification agreement ("Gary's January 1, 2015 IA"), which was dated January 1, 2015, "did not exist until after the Company [had] filed its complaint in the Delaware Court of Chancery"—a conclusion that was "based on a forensic review."[35] Gary Perryman attended this meeting and objected to the declaration of invalidity, stating that the Board did not have the power to declare the indemnification agreements invalid.[36] The minutes of the meeting do not indicate

---

[32] Trial Tr. 375–76; Trial Tr. 372.
[33] Trial Tr. 376–78; JX 04; JX 30.
[34] JX 46, at 5.
[35] JX 46, at 6.
[36] JX 46, at 6.

8

that Gary objected to the Board's determination that both his and Laura's IAs were executed after the DOJ's civil investigative demand was made, however.[37]

### 3. This Advancement Action

On February 11, 2020, Laura and Gary filed a verified complaint (the "Verified Complaint") seeking advancement and indemnification along with a motion for a temporary restraining order and a motion to expedite.[38] To the Motion for a Temporary Restraining Order, Laura attached Laura's January 1, 2018 IA.[39] The Verified Complaint also stated that Gary executed his IA on June 25, 2019, although the attached exhibit shows his indemnification agreement bears a date of "January 1st, 2015" ("Gary's January 1, 2015 IA").[40] The Petitioners filed a motion for judgment on the pleadings, to which they again attached Laura's January 1, 2018 IA and averred that Gary had signed Gary's January 1, 2015 IA on June 25, 2019.[41]

Stimwave opposed the motion, arguing that both Laura's January 1, 2018 IA and Gary's January 1, 2015 IA were invalid and void *ab initio*.[42] In particular, Stimwave alleged that Laura's January 1, 2018 IA, despite bearing a 2018 date, was

---

[37] JX 46.

[38] Verified Compl. For Advancement and Indemnification, Dkt. No. 1 [hereinafter "Compl."].

[39] Exhibits 1-6 to Petitioners' Opening Br. in Supp. of Their Mot. For a Temporary Restraining Order and Mot. To Expedite, Ex. 3, Dkt. No. 1.

[40] Compl. ¶ 24; Exhibits 1-6 to Petitioners' Opening Br. in Supp. of Their Mot. For a Temporary Restraining Order and Mot. To Expedite, Ex. 4, Dkt. No 1.

[41] JX 55, at 5, Ex 3.

[42] Respondent's Answering Br. in Opp'n to Petitioners' Mot. For J. on the Pleadings 17–20, Dkt. No. 17 [hereinafter "MJP Answering Br."].

9

created and signed on November 11, 2019, after the DOJ civil investigative demand had been made.[43] Stimwave also noted that Gary's Agreement was dated January 1, 2015, but could not have existed at that time because the Board did not approve a form of indemnification agreement until three years later, around April 2018.[44] Further, Stimwave argued that if Gary's word was true, and his indemnification agreement had been signed in June of 2019, it was still invalid because the Series D stockholders did not approve the agreement as, per Stimwave, was required by the Company's Charter.[45] And the same logic applied to Laura's January 1, 2018 IA, even setting aside the conflict issue of her entering into an IA *after* a DOJ investigative demand had already been made.[46]

### 4. Laura's Purported Indemnification Agreement

The Perrymans filed their reply brief to the Motion for Judgment on the Pleadings on March 25, 2020.[47] Attached to that reply brief were affidavits from both Laura and Gary Perryman. Laura's affidavit stated:

> I originally signed my indemnification agreement by hand in April of 2018. Attached to this affidavit as Exhibit A is a copy of my Indemnification Agreement executed by hand-written signature. I dated my Indemnification Agreement January 1, 2018 because that was the date initially included on the default template of the agreement.[48]

---

[43] MJP Answering Br. 2–3, 17–18.
[44] MJP Answering Br. 19; *see* JX 16.
[45] MJP Answering Br. 3–4.
[46] MJP Answering Br. 3–4.
[47] Petitioners' Reply Br. in Supp. of Mot. for J. on the Pleadings, Dkt. No. 20.
[48] *Id.*; JX 56 ¶ 7.

10

Although Laura's affidavit attached the hand-written signature page of the indemnification agreement, that signature page—like the other indemnification agreements' signature pages—bears no date.[49] Laura did not produce the original hard copy remainder of the indemnification agreement, nor a digital copy of that signature page with metadata dating to April 2018.[50] At trial, to explain this lack of metadata, Laura testified that, at the time, she had scanned "just the signature pages" of her and Gary's IAs on her home printer, "and then put them onto [her] computer, [her] work computer."[51] She then merged the scanned signature page into the other pages of the IA sometime later.[52] After merging the scanned signature page with the other pages of the IA, she "deleted it and [she] didn't need it anymore."[53] Further, the merged document did not have metadata dating back to any time in 2018, because Laura "got a new computer sometime in the summer of 2018. And the computer from April was repurposed and redistributed to someone else in the company."[54] She also testified that she was not involved in the process of reassigning work computers at the Company, but that she "just made sure that all [her] data was, you know, backed up onto the Time Machine and then put on the new computer. So

---

[49] JX 56, Ex. A.

[50] In fact, no metadata containing any date of creation for the scan of Laura's hand-signed signature page was provided at trial.

[51] Trial Tr. 39–40.

[52] Trial Tr. 175.

[53] Trial Tr. 198.

[54] Trial Tr. 40–41.

11

once it was on the new computer, I would give the old computer over."[55]  Finally, Laura emphasized that when a new version of the IA was saved, that document would bear a new creation date.[56]  Thus, according to Laura, she did not have metadata for the original scanned signature page because she deleted the document after merging it with the other pages of the IA, and she did not have metadata for the merged IA because she switched computers shortly after and each time she switched computers, the merged IA would have a new creation date.

Given the absence of any metadata, to support her claim that she signed her indemnification agreement in April 2018, Laura testified to particular facts regarding her signing of the agreement.  She testified that she and Gary signed their agreements "at the same time" in their home in Florida.[57]  And she testified that Gary reminded her that this occurred in April because *he* remembered and reminded her of specific details.[58]  For example, Gary purportedly reminded her that the scanner had gotten stuck, that he had gotten food on one of the documents, and that Laura had been angry with him because she wondered if the food stain was going to show up on the scan.[59]

---

[55] Trial Tr. 41.
[56] *See, e.g.*, Trial Tr. 131.
[57] Trial Tr. 148.
[58] Trial Tr. 184–186.
[59] Trial Tr. 186–87.

Gary also testified regarding their agreements, stating that they were created in April 2018. His testimony did not otherwise corroborate Laura's, however. Gary testified that, not only did he have no recollection of any of the details that Laura testified he had used to refresh her knowledge (the malfunctioning scanner, the food spill on the document), but also that such were not the sort of details he would "even recall" because "[i]t's just not something that I think about."[60]

At trial, Laura also repeatedly remarked that *when* she signed the documents was "not a big deal[,]"[61] that she did "not know why it was relevant or important to include any dates,"[62] and that details surrounding her purported signing in April 2018 were not "important details"[63] because she was sure that she "executed [her] agreement at the same time as all the other board members, which [she], as the CEO, executed for them."[64] Indeed, Laura made perfectly clear at trial that the date discussion "seem[ed] like a lot to do about nothing, really."[65]

---

[60] Trial Tr. 295–98.

[61] Trial Tr. 146:17–19 ("[T]here's like not a big deal about when we executed these agreements. It was everyone together at the same time.").

[62] Trial Tr. 203:6–7.

[63] Trial Tr. 189:8–10 ("I don't really remember, and I also don't agree with your statement that any of these are important details. What's important is that we signed the documents in April 2018.").

[64] Trial Tr. 203 ("I do not know why it was relevant or important to include any dates. . . . I'm telling you that I executed my agreement at the same time as all the other board members, which I, as the CEO, executed for them.").

[65] Trial Tr. 185–186.

At trial, other evidence relevant to Laura's credibility was presented. For example, Laura's answers to interrogatories—never amended—state that Laura had hard copies of her indemnification agreement in her home.[66] At trial, she testified that the interrogatory response was a "mistake" and that she does not have the original hard copy of her hand-signed indemnification agreement from April 2018.[67]

Laura's counsel for the DOJ's civil investigative demand (her "DOJ counsel") also represented to Stimwave in an e-mail on Laura's behalf that the laptop in Stimwave's possession "was Laura's sole computer since 2011."[68] At trial, however, Laura testified that she had approximately four work computers between April 2018 and November 2019,[69] and, in particular, that she "got a new computer sometime in the summer of 2018. And the computer from April was repurposed and redistributed to someone else in the company."[70] That switch in computers is critical to Laura's explanation for why she cannot produce metadata for the scan of the April 2018 hand-signed signature page or the original merged IA—which is purportedly because she merged the April 2018 signature page into the other indemnification agreement pages, deleted the scan of the signature page, and the merged IA would have a new creation date when she changed computers.[71] Regarding her DOJ

---

[66] JX 62, at 11.
[67] Trial Tr. 143.
[68] JX 51.
[69] Trial Tr. 41.
[70] Trial Tr. 40–41.
[71] Trial Tr. 129.

counsel's representation that the laptop in Stimwave's possession "was Laura's sole computer since 2011,"[72] Laura testified at trial that her counsel "made a mistake. What he was supposed to say is that it contained information dating back to 2011, personal privileged information.  My records and files on that computer are dating back to 2011."[73]  The full text of the relevant part of Laura's DOJ counsel's January 30, 2020 e-mail is as follows:

> First, regarding Becky's[74] computer that is in your possession.  I can confirm that the computer in your possession contains personally privileged information.  More specifically, that was Laura's sole computer since 2011.  Laura has both personal legal matters on that computer and legal matters related to other companies.  For example, there is legal advice on personal tax advice, legal advice related to the sale of a home in Arizona, and legal advice related to StimQ, Stimguard, Micron and other entities that Laura owns.  I would like to discuss a way forward on this.  And, in the interim, I am requesting a return of that computer.

> Second, you inquired if Lauara [*sic*] had another computer.  After Laura stopped using the laptop in your possession, she purchased, with her own money, another laptop.  That laptop contains some company information, but all of it would [be] post issuance of CID and captured on company servers (email) or in dropbox [*sic*].[75]

Laura's DOJ counsel did not mention that Laura had any other computers since 2011.[76]

---

[72] JX 51.
[73] Trial Tr. 225.
[74] Becky is the name of the recipient of this e-mail and this reference to "Becky's computer" appears to be a typo.
[75] JX 51.
[76] *See* JX 51.

## 5. Gary's Purported Indemnification Agreement

The other foundation upon which Laura relies to prove she signed her indemnification agreement in April 2018 is that she signed her agreement with Gary, and Gary's agreement was signed in April 2018. But the execution date of Gary's IA is also subject to challenge. For one, Gary's agreement was dated January 1, 2015.[77] But Laura and Gary stated in their Verified Complaint that Gary executed his agreement on June 25, 2019.[78] Gary later stated in an affidavit and testified at trial that he signed his indemnification agreement "at the same time" as the other directors—*i.e.* in April 2018.[79] Gary testified at trial that signing his indemnification agreement was an important event that he would remember, just like 9/11 or taking his family to Disneyland.[80] But Gary could not remember specific details about the signing, including the food spillage or broken scanner that Laura testified that he reminded her of.[81]

In his affidavit attached to the Reply Brief for the Motion for Judgment on the Pleadings, Gary stated:

---

[77] Exhibits 1-6 to Petitioners' Opening Br. in Supp. of Their Mot. For a Temporary Restraining Order and Mot. To Expedite, Ex. 4, Dkt. No 1.

[78] Compl. ¶ 24.

[79] Trial Tr. 300.

[80] Trial Tr. 289; *see* Deposition of Gary Perryman 115 ("The question is do I know that I signed it—again, I remember that date because it was important to me, just like, you know, other dates that we all remember. Anything that's important to me, or, you know, I remember. I mean, you know, obviously if somebody says what date did the Twin Towers blow up, 9-11, we all remember it, you know. So these are things you put in your memory bank, other things I don't.").

[81] Trial Tr. 187; Trial Tr. 295–98.

I originally signed my indemnification agreement on April 20, 2018 and it was scanned the same day. . . . In June 2019, my executed signature page was married to the other pages of the document in preparation for a diligence review by the Company. This completed document had a January 1, 2015 retroactive date in accordance with the agreement that the indemnity for directors be retroactive to their original date of service. I did not personally have involvement in the record consolidation, these items were handled by legal counsel for Stimwave.[82]

At trial, Laura corroborated Gary's statement, testifying that "when [she] went to merge Gary's [IA], [she] typed in the date of service and his name into the document."[83] But Gary joined the Board in 2013, not 2015.[84] And Laura had previously testified that her own indemnification agreement bore the date January 1, 2018, because "[i]t's the form template agreement, so it's never changed. [I]t was just January 1, 2018."[85]

However, unlike Laura, Gary did provide metadata for his signature page showing a creation date of April 20, 2018.[86] To explain metadata, the Petitioners provided an expert witness, Erik Hammerquist, who is a senior director of digital forensics at FTI Consulting.[87] During cross-examination, Mr. Hammerquist testified that the metadata that he had analyzed, from Gary Perryman's indemnification

---

[82] Aff. of Gary Perryman in Supp. of Petitioners' Reply Br. in Supp. of Mot. For J. on the Pleadings ¶¶ 7, 9, Dkt No. 20 [hereinafter "Gary's Reply Affidavit"].
[83] Trial Tr. 197–98.
[84] JX 67.
[85] Trial Tr. 59:16–17.
[86] JX 3.
[87] Trial Tr. 331.

17

signature page, was not, in fact, the metadata associated with the source file but was rather the metadata associated with a copy of the source file.[88]  Mr. Hammerquist also testified that, not only was it possible to edit internal file metadata of a PDF (including the created and modified dates),[89] but "anybody with a computer can easily edit the internal file metadata in a PDF."[90]  To demonstrate the ease with which internal file metadata can be modified, Stimwave's counsel showed the deposition of Mr. Hammerquist, wherein counsel showed Mr. Hammerquist a copy of his notice of deposition, along with metadata showing a creation and modified date of April 20, 2018.  Mr. Hammerquist agreed that the notice of his deposition was not, in fact, created or modified on April 20, 2018.[91]

### C. Procedural History

The Perrymans filed their Verified Complaint for Advancement and Indemnification on February 11, 2020, along with their Motion to Expedite and Motion for a Temporary Restraining Order.  On February 20, 2020, I granted the Motion to Expedite but denied the Motion for a Temporary Restraining Order.  The Perrymans moved for Judgment on the Pleadings on March 6, 2020, which I denied from the bench on April 1, 2020 because the validity of the indemnification

---

[88] Trial Tr. 342.
[89] Trial Tr. 351.
[90] Trial Tr. 354.
[91] Trial Tr. 352–55.

agreements was disputed.[92]  At that time, I also ordered Stimwave to advance Laura

and Gary's fees pending a final determination of their entitlement to advancement.[93]

After contentious discovery, this case was tried over two days on September 28–29,

2020.  The parties submitted post-trial briefing and I heard post-trial oral argument

on November 13, 2020.  I consider the matter fully submitted as of that date.

## II. ANALYSIS

This case presents discrete issues with respect to each of the IAs.  However,

Stimwave argues that a single inquiry—the date of execution—is determinative for

each.  This is because the Board had authorized indemnification and advancement

agreements, and Laura had the power unilaterally to execute such agreements on

behalf of Stimwave, prior to April 23, 2018, at which point the Charter was amended

to facilitate an investment in Stimwave by giving Series D equity holders a veto

over, among other things, certain insider contracts and the extension of corporate

benefits.[94]  The Charter was again amended a few weeks later, on July 17, to provide

that any attempt to circumvent the Series D rights would be void *ab initio*.[95]  As a

result, per Stimwave, if the Perryman's IAs were entered after April 23, 2018, or at

---

[92] 4-1-2020 Oral Arg. Re Petitioners' Mot. For J. on the Pleadings and the Court's Ruling, Dkt. No. 45.
[93] *Id.*
[94] JX 16.
[95] JX 21.

19

least after July 17, 2018, they are unenforceable. I therefore begin this analysis with the Charter, as amended on April 23.

*A. The Charter Amendments in April and July of 2018 provided the Series D equity holders a veto right over Laura's IA, but not Gary's.*

The Charter gives Series D holders veto right over two types of transactions potentially applicable here. The first, set out at Article V, Section 6(d)(xiii), involves "any Affiliate Transaction . . . by the Corporation . . . ."[96] "Affiliate Transaction" is a defined term meaning "any transaction with an officer, director, employee or stockholder of the Corporation, or any of their affiliates, outside of the ordinary course of business."[97] Both Perrymans are Affiliates under the definition, but offering directors indemnification and advancement—particularly where advancement rights are guaranteed elsewhere in the charter[98]—are, to my mind, clearly in the ordinary course of Stimwave's business. Construing the Charter as a whole, moreover, reveals that employee contracts done in regular course are addressed, as discussed below.[99] Series D approvals for the Perrymans' IAs are not required as Affiliate Transactions, therefore.

The second Charter section at issue, Article V, Section (6)(d)(xviii), requires Series D approval for "adopt[ion] or amend[ment of] any cash bonus, severance

---

[96] JX 19, at Art. V, § 6(d)(xiii).
[97] JX 19, at Art. V, § 6(a)(x).
[98] *See* JX 19, at Art. X, § 2.
[99] *See* JX 19, at Art. V, § 6(d)(xviii).

20

agreement, employment agreement . . . or benefits . . . ."[100] *Pace* the Petitioners, the right to advancement is clearly a "benefit" as that word is used in common English[101] and, I find, the Charter. Approval under this sub-Article is limited to benefits extended to "executive officer[s] or member[s] of senior management."[102] This would apply to Laura, but not Gary, if Laura's IA was entered after April 23, 2019, at a time when she was still CEO. Gary, however, was not a Stimwave executive. I accordingly conclude that Gary's IA does not require Series D holder approval to be valid, but that Laura's IA may, depending on when her IA was executed and whether she was an officer of Stimwave at that time.

In post-trial briefing, the Perrymans appear to argue that various provisions in Stimwave's Charter and Bylaws preclude the possibility that Series D holders can have a veto right over any advancement or indemnification right of the directors.[103]

---

[100] JX 19, at Art. V, § 6(d)(xviii).

[101] *See, e.g.*, The Shorter Oxford English Dictionary, Vol. 3, at 181, defining "benefit" in "the usual sense" as that which provides an "advantage, profit or good."

[102] JX 19, at Art. V, § 6(d)(xviii).

[103] They also appear to argue that the Charter and Bylaws mean that no separate indemnification and advancement agreement was needed to give the directors indemnification and advancement. Petitioners' Opening Post-Trial Br. 28, Dkt. No. 106. I do not reach the question of whether that is true for indemnification—*see* JX 13, at Art. VIII, § 1—but it is certainly not true for advancement, as the quoted provision in the Bylaws is silent as to advancement. JX 13, at Art. VIII, § 1. And Article X, Section 2 of the Charter, the language of which tracks 8 *Del. C.* Section 145(f), does not itself grant a right to indemnification or advancement—it simply notes that any right granted cannot be eliminated or impaired *after* an act triggering any such rights has already occurred. Lastly, I note that I consider unpersuasive the Petitioners' argument that, because the Form of Indemnification Agreement and the April 23, 2018 charter amendment were approved at the same time but did not reference each other, the IAs must not require subsequent Series D stockholder approval. Petitioners' Opening Post-Trial Br. 29–30, Dkt. No. 106. I find that a lack

For example, the Perrymans argue that the Bylaws command indemnification as a matter of course, noting that Article VIII, Section 1 of the Bylaws provides that the "Corporation *shall indemnify* any and all of the directors or officers, including former directors and officers . . . to the fullest extent permitted under and in accordance with the laws of the State of Delaware."[104] This provision is unhelpful to the Petitioners, limited as it is to *indemnification* and not advancement. Although "[o]ur law has never denied that advancement is a subsidiary concept within the broader topic of indemnification[,] . . . it has maintained for a generation that the terms advancement and indemnification are not synonymous. Because rights to indemnification and advancement differ in important ways, our courts have refused to recognize claims for advancement not granted in specific language clearly suggesting such rights."[105] The matter before me currently is a petition for advancement; I am not ruling on either Perryman's right to indemnification and nothing in this Opinion should be construed as such.

Similarly, the Perrymans point to the Company's Charter at Article X, Section 2, which provides that "[a] right to indemnification or to advancement of expenses

---

of reference between the two Board resolutions, although they are contained in the same document, to be largely, if not entirely, irrelevant.

[104] Petitioners' Opening Post-Trial Br. 28 (emphasis in the original) (quoting JX 13 and adding emphasis), Dkt. No. 106.

[105] *Majkowski v. Am. Imaging Mgmt. Servs., LLC*, 913 A.2d 572, 589 (Del. Ch. 2006). The Petitioners do not argue that the term "indemnify" in the Bylaws is used elsewhere to include advancement, but conclusorily assume that it does. Petitioners' Opening Post-Trial Br. 28, Dkt. No. 106.

arising under a provision of this Certificate of Incorporation or a bylaw of the Corporation shall not be eliminated or impaired by an amendment to this Certificate of Incorporation after the occurrence of an act or omission that is the subject of the civil, criminal, administrative, or investigative action, suit, or proceeding."[106] This particular provision is inapplicable to Laura and Gary here. Neither the Charter nor Bylaws provided a right to advancement and Stimwave has not purported to eliminate any indemnification right under the Charter.

Neither the Bylaws nor the Charter precludes the Company from granting to an investor a veto right over extension of advancement benefits to its directors and officers. Whether Laura's IA is valid accordingly turns on when that document was executed, which in turn determines whether such document required approval from the Series D stockholders to be valid. Laura's IA was not submitted to the Series D equity holders for approval. I turn, then, to the timing of the agreement's execution.

*B. Laura's IA was not executed until November 2019.*

By the beginning of November 2019, Stimwave was under investigation by the DOJ. On November 10, Stimwave's co-Chairman of the Board told Laura that she needed to step down as CEO, in light of the investigation. It is unclear whether she agreed.[107] The next day, she provided the Board, for the first time, with a copy

---

[106] Petitioners' Opening Post-Trial Br. 27–28 (quoting JX 19), Dkt. No. 106; *see* 8 *Del. C.* § 145(f).
[107] As mentioned above, Laura testified at trial that she did not step down on November 10, 2019, but at deposition, she answered that she did. Trial Tr. 169:8–11, 17–19.

23

of her IA, with an electronic signature, dated January 1, 2018. Based on this document, Stimwave extended advancement rights to Laura. When that document was subsequently challenged, based on metadata showing execution in November 2019,[108] she provided a copy of another signature page, signed in cursive but undated. She now admits that the January 1, 2018 date is incorrect—an artifact, she says, of a template for the agreements—but avers that she actually entered the IA in April 2018, shortly after the Board adopted a form agreement to extend advancement rights. The metadata evidence showing creation in November 2019 is of no moment, per Laura; the original metadata of the signature page had been deleted or left behind on an old computer when the electronic copy of the merged IA was placed on her new computer. Laura and Gary maintain that they entered their IAs together, in their kitchen, on April 20, 2018. These assertions arose, I note, after Stimwave pointed out its belief that Laura had no authority to unilaterally enter IAs in 2019.

Stimwave contends that, although Laura was authorized to enter Stimwave into IAs as of April 20, 2018, for some reason she declined or neglected to accept this benefit for herself and Gary, and that both IAs were created on November 11, 2019, after Laura had or anticipated advanceable expenses, and after she had stepped down as CEO.

---

[108] A director checked the metadata on the document and brought the resulting discrepancy to the Board's attention.

Laura is unable to find an original, dated copy of her IA, and the metadata indicates the IA was created on November 11, 2019. The only evidence for the April 2018 date for Laura's IA is the self-serving testimony of Laura and Gary. The issue, thus, is one of witness credibility.

Any judge not apprehensive that he may misapply indicia of the credibility of witness testimony suffers from hubris. Nonetheless, such an application is at times unavoidable. It is so here. I start with the understanding that Laura provided Stimwave with a copy of the IA the day after being told she should step down as CEO in light of the DOJ investigation, and that that copy had an electronic signature, although she and Gary now maintain it was signed manually.[109] She cannot locate a physical copy of the IA that she once represented was in her possession.[110] Further, the document Laura produced had a fictitious date of January 1, 2018—a fact that, per Laura, is an artifact of the template from which it was created.[111] When challenged by Stimwave on the fact that the metadata did not support the January 1, 2018 date, Laura alleged that the metadata indication that the document was created on November 11, 2019 was irrelevant, because she had previously signed a copy and

---

[109] Laura testified at trial that she electronically signed the indemnification agreement that was signed and provided on November 11, 2019 because "hand-signed agreements, they don't copy well from time to time and time again. Much better off having a DocuSign version. And that's what I did. I just made a DocuSign version because it's easier to read." Trial Tr. 229.

[110] Trial Tr. 143:4–5 ("[W]e weren't able to find the hard copy . . . .").

[111] The fictitious date is not dispositive. With one exception, all Stimwave director IAs show fictitious dates. JX 60.

scanned it. That original scan had been deleted "[p]robably a long time ago,"[112] per Laura, and any metadata associated with her original signed or merged IA was overwritten when she switched to her "new computer,"[113] theoretically acquired by her in the summer of 2018.[114] She acknowledges, however, that the January 1, 2018 date is incorrect, and has averred that the document was entered in April 2018, immediately before the Charter was amended to require series D approval.

Her testimony to the same effect, in other words, is self-serving; that does not make it untrue, however. Her story—that the Perrymans' IAs were both entered in April 2018 at the kitchen table, is corroborated by Gary. Interestingly, Laura testified that her memory was clarified after discussing the matter with Gary, who refreshed her recollection of memorable details, such as a problem with the scanner and his having spilled food on the documents. At trial, however, Gary had no memory of this, and denied it was the kind of detail he would have remembered. Also cutting against Gary's testimony on Laura's behalf is that he attended the December 20, 2018 Board meeting that determined that Laura's IA was invalid because it was not created until after the DOJ investigation was launched. Gary objected that the Board lacked the authority to act on this determination, but

---

[112] Trial Tr. 198:13–17.
[113] Trial Tr. 40–41.
[114] Her DOJ counsel, however, indicated to Stimwave on her behalf that as of January 30, 2020, Laura had had but one computer since 2011. JX 51.

26

apparently did not explain that the factual predicate was wrong, because (as he now maintains) Laura's IA was created long *before* the DOJ investigation and her resignation as CEO.

In other words, the evolving and self-serving narrative of the kitchen-table executions makes me suspicious as to their truth. Cutting against this suspicion is the undeniable authority that Laura had to enter the IA before April 23, 2018. She entered such contracts on behalf of Stimwave with other directors.[115] The IA would provide a benefit to her; the Stimwave Charter provides for indemnification for directors, but not advancement, whereas the IA provides both. It would have thus been in her interest to timely execute an IA. Stimwave has offered no explanation why, if they are correct, she failed to take advantage of this opportunity to secure advancement rights.

Ultimately, again, this determination comes down to credibility. Laura did not, in my opinion, testify truthfully. She came across as someone who had created a story to fit the facts, adjusted it as it became apparent that it would be advantageous to do so, and who was attempting to buttress that story by concocting details, an attempt frustrated when Gary's testimony contradicted those details. Her entire demeanor struck me as consistent with both the evolving nature of her story and the Perrymans' apparent belief that it should not matter when the IA was created, as

---

[115] Including Gary, as I find below.

27

reflected in Gary's objection at the December 20, 2019 Board Meeting that the Board had no right to determine that the IA was invalid.[116] Indeed, at trial, Laura stated multiple times her belief that the timing of the IA's execution should not matter. For example, she testified that "there's like not a big deal about when we executed these agreements. It was everyone together at the same time";[117] "I don't really remember, and I also don't agree with your statement that any of these are important details. What's important is that we signed the documents in April 2018";[118] "I do not know why it was relevant or important to include any dates. . . . I'm telling you that I executed my agreement at the same time as all the other board members, which I, as the CEO, executed for them";[119] and "we signed it in April when I signed everybody else's. And it seems like a lot to do about nothing, really."[120] I find it more likely than not that Laura's testimony was untruthful, and that her IA was executed for the first time on November 11, 2019.

Does that render Laura's IA unenforceable? Stimwave contends that it is void *ab initio*, as not approved by the Series D equity holders, because it provided a benefit to an executive officer under the Company's Charter Article V, Section 6(d)(xviii). I note that Laura has provided inconsistent statements as to whether or

---

[116] JX 46, at 6.
[117] Trial Tr. 146:17–19.
[118] Trial Tr. 189:8–10.
[119] Trial Tr. 203:6–7, 16–18.
[120] Trial Tr. 185–86.

not she was still Stimwave's CEO on November 11, 2019. She testified at trial that she did not step down as CEO on November 10, 2019.[121] But at her deposition, she stated that she did step down on that date.[122] Ultimately, however, the answer is irrelevant. If she did not step down as CEO on November 10, 2019 and she signed the IA on November 11, 2019, as CEO, she would have been subject to the requirement of Charter Article V, Section 6(d)(xviii) that she obtain Series D equity holder approval for the IA. If she did step down, that provision would be inapplicable; in that case, however, she was without authority to bind Stimwave contractually. In either event, Laura's IA was a nullity.

Laura argues that she should be considered to have advancement rights, as do the other directors, regardless of when she attempted to enter the IA. This argument I find sympathetic. Laura was the founder of Stimwave; without her efforts, Stimwave would likely not exist. She had an opportunity to secure advancement rights, but failed to seize it. She has indemnification rights under the Charter, but those may prove pyrrhic absent funds to vindicate her legal rights. Nonetheless, this is a matter of contract, not equity.[123] Likewise, her suggestion, invoking the unclean hands doctrine, that Stimwave should be estopped from contesting advancement for

---

[121] Trial Tr. 169:8–11.
[122] Trial Tr. 169:17–19.
[123] I make no determination of the equities of the matter, in any event.

her since it has not so denied it to others, is unavailing as a matter of contract law. Her after-the-fact attempt to create an advancement obligation for Stimwave is void.

*C. Gary's IA was signed on April 20, 2018 and is therefore valid.*

While Gary's IA was not subject to Series D approval, as explained above, if (as Stimwave asserts) it was executed by Laura on behalf of Stimwave after she stepped down as CEO, presumably it would be unenforceable. I therefore proceed to determine the date of execution of Gary's IA.

As with Laura, I found Gary's testimony regarding the dual kitchen-table executions self-serving and less than convincing. Nonetheless, I must determine the entry date of his IA independently from Laura's, by a preponderance of the evidence. One thing that emanated from Gary's testimony with a ring of truth is that, as a director of Stimwave, he has been remarkably unengaged.[124] He also testified convincingly that his computer skills are poor.[125] And I am convinced that he was poorly engaged in creating discovery responses in this action, as well.

---

[124] Gary work history includes occupations as a bodyguard, in a training business, and as a producer and director in the infomercial business, which focused on fitness equipment. Trial Tr. 254–255. He described being on Stimwave's Board as "more like a labor of love. I didn't get paid and I was only interested in making sure that I could contribute something by being a different type of viewpoint." Trial Tr. 252:11–15. Gary testified at trial that he did not "focus on corporate governance issues in [his] capacity as a director of Stimwave," that he did not know what relief he was seeking in the Complaint that was filed without looking at the Complaint, and that he didn't know what he was asking the Court to do in this lawsuit. Trial Tr. 268. He also testified that he didn't know where Stimwave keeps its corporate records, Trial Tr. 270, and it is unclear whether he even read the complaint filed by Stimwave against him and his wife in December 2019. Trial Tr. 272–273.

[125] Gary testified that he does not own a computer, has never owned a computer, and that Laura was the one to scan both his and Laura's IAs into the computer because "she's the one who takes

30

The Verified Complaint and the Petitioners' Motion for Judgment on the Pleadings aver that Gary's IA was signed on June 25, 2019. The document bears a date of January 1, 2015. Gary testified at trial that he executed the document in April 2018, which is contemporaneous with the time the other Stimwave directors executed their IAs. At trial, Gary contended that the original sworn-to creation date—June 25, 2019—was the result of an innocent error.[126] Gary's affidavit, filed with the Petitioners' Reply Brief for the Motion for Judgment on the Pleadings posits that the January 1, 2015 date was intentional—and done "in accordance with the agreement that the indemnity for directors [was to] be retroactive to their original date of service."[127] Gary became a director in 20*13*, I note.[128] And at trial, Gary had no idea "how [the January 1, 2015 date] got on there"[129] and, when opposing counsel asked whether "the date was to coincide with when [he] joined the board,"[130] Gary responded "No. I don't know what that date is, coincides with."[131]

Unlike with Laura's IA, however, Gary's testimony that he executed the IA in April 2018 is corroborated by metadata for his signature page, which indicates the

---

care of things like that. It's not something I do." Trial Tr. 251:7–14. When asked at trial whether he saved his IA to Stimwave's Dropbox, he testified that "I don't even know how to get on Dropbox, so no." Trial Tr. 270–271.

[126] Trial Tr. 276:5–9.

[127] Affidavit of Gary Perryman in Supp. of Petitioners' Reply Br. in Supp. of Mot. For J. on the Pleadings ¶ 9, Dkt. No. 20.

[128] Trial Tr. 313; JX 67.

[129] Trial Tr. 311:5–8.

[130] Trial Tr. 311:22–24.

[131] Trial Tr. 312:1–2.

31

page was created on April 20, 2018.[132] I find it more likely than not that this was the creation date.

In rebuttal, Stimwave points to the testimony of Petitioner's own expert witness, Mr. Hammerquist, that what he analyzed to determine the creation date via metadata was only a copy of the source file for the document—not the original—and that in any event, a computer user with sufficient knowledge can easily modify metadata to indicate creation on any date desired. I accept this representation as fact. However, it fails to convince me that Gary's metadata was so manipulated. First, Gary testified believably that he has poor computer skills.[133] I find it most unlikely that he manipulated the metadata. Laura may have the ability to manipulate metadata. It is unlikely that she would have manipulated Gary's metadata instead of her own, however; Laura is the true target, for instance, of Stimwave's substantive fiduciary-duty action, which is a main driver of advanceable expenses. The allegations against Gary, I note without so finding, appear little more than make-weights.

It is more likely than not, I find, that Stimwave (via Laura) and Gary entered his IA on April 20, 2018, around the time Stimwave entered indemnification and advancement agreements with the other directors. For the reasons above, I find it is

---

[132] JX 3.

[133] *See* note 123 *supra*.

likely that Laura would want to secure this benefit for Gary soon after it became available. I find that Gary's IA is valid and binding on Stimwave.

### III. CONCLUSION

For the reasons stated above in this post-trial Memorandum Opinion, I find that Gary Perryman has an enforceable advancement right against Stimwave for indemnifiable litigation expenses relating to his status as director of the company. I find Laura Perryman's purported contractual right to advancement against Stimwave is void.

The Parties should provide an appropriate form of order, invoking the *Fitracks* rubric for allocation of expenses.[134]

---

[134] *Danenberg v. Fitracks, Inc.*, 58 A.3d 991 (Del. Ch. 2012).